As I understand, I will have 20 minutes total? Fifteen. Thank you. Good morning, Your Honors. Myles Clements, appearing on behalf of International Offshore. We are the appellant with respect to the district judge's treatment of a statute and the limitation of liability defense which we raised in the court below. Our appeal calls for, Your Honors, to conduct a de novo review of the interpretation of the federal statute and the motion for summary judgment entered below in which the district court found that pulling a seven-and-a-half-foot metal tube which doesn't float constituted towing such that my captain was required to possess a towing license. Why is this a question of statutory interpretation subject? Isn't this a question of the jury instructions given to the jury? The court during the trial gave a special instruction to the jury, and it derived from the judge's ruling of the motion for summary judgment which had been brought pretrial in which he instructed the jury at that point and then again in deliberations in response to a jury's note that this was an act of towing and the captain was required to have a towing license. But just procedurally, you brought the motion pretrial, correct? I did. And then he denies your motion. And Sue A. Sponte found the reverse of what we were asking. But then it doesn't come up again until you're on direct with Fazio, is that how you pronounce  Oh, Fazioli. Fazioli, excuse me. Is that — that's where the jury hears anything that could be affecting its assessment of limited liability? Well, we put on substantial evidence that this act of sonar surveying was not a towage in any traditional or conventional case. My point is to assess what the alleged error is here, it would seem to me it's an error of instruction to the jury. I would agree. Okay. So if it's that, would you also agree that when Judge Afric said you can't go into that direction, you would just ask the witness, does he need a towing license? If he says no, where do you object at that point? We — is your question procedural? Did we have a pending objection? Yes. Yeah, we did when we brought our motion for summary judgment. So you're relying on — to assert that you objected to the instruction he gave, you're stating that his ruling against your pretrial motion preserved that at the evidentiary moment? I did. And I think we were clear on the record I would have to find it in the transcript, but this came up, I specifically said, when we were — during the trial when we were arguing this issue, and the judge had given his special instruction to the jury based on his pretrial ruling, I said, Your Honor, we have never waived our objection to — Now you're — but what you're — now, if that's what you're stating, that was in answer to a jury question on February 24th. No. That was during the trial, and then again in response to the question. All right. I don't remember that, and I look pretty closely at the record. I remember him saying, well, whatever the truth or right or wrong of this legal issue — this is during the testimony — the judge said, You're free to argue whether this had any effect on the accident. And then you went ahead. You said fine, and you go ahead and you inquire further, and you elicit from Paris, and you elicit from this gentleman, and then from Gardone. It seems almost a consensus that the jury heard that even had there been a towing license, it wouldn't have given any instruction as to subsurface sonars. So I guess I'm wondering two questions. Well, I think when the judge — if he didn't make himself clear before, he instructed the jury in response to the question — I agree, and I don't want to take your time. That, to me, is the only place that's preserved. That's just my view. But that's a vital moment, so I intend to ask opposing counsel about that, too. Do you remember what the nature of your objection then was, though? The nature of — well, the jury asked the question. The jury asked whether this was towage — whether the captain was required to have a license and whether the — my client, management, the vessel owner, knew about what license he had. The jury asked the question. Yeah. He gives the answer. Then he says, objection by international. You respond, we reserve our objection to the court's, with all due respect, underlying ruling, and we don't mean to acquiesce in that ruling, but with respect to the court's answer to that question, we view it as appropriate. View — What — how was Judge Africk on notice that the answer wasn't correct if you said with respect to the answer you're giving them, we view it as appropriate? We — Was that supposed to be consistent with his prior ruling? Yeah. We — Was he ruled that way? We disagreed with the underlying ruling. It came up several times. We repeatedly were on record that we did not believe this was towage. And — If you thought that that pretrial ruling was sufficiently emphatic to be an objection that doesn't require you to object when the witness is testifying or to clarify further, why is it that you asked the witness himself, does he need a towing license? If Judge Africk had made such an emphatic ruling, you didn't even need to preserve an objection, why would you have asked your witness, does he need a towing license? Trying to change the judge's mind? Because that's what I believe — If you're trying to change his mind, then you're out of the narrow line of authority that doesn't rule 51, that doesn't require you to be really clear with Judge Africk. I — with all due respect, I submit that there was no confusion with Judge Africk that we disagreed that this was towage at all. All right. And — Then shift to the merits argument. Your argument that it was a legally erroneous instruction turns on your — you acknowledge  And factually here, it's a tow fish with a tow cable and a tow winch, but you still say that's an absurd construction. Yes. That's the reason we would find that he committed legal error? Because it's absurd in other hypotheticals? No, because the statute in question states that anything — that a vessel in the act of pulling, hauling alongside — let's just talk about pulling, which applies here. If a vessel pulls, it is performing towage, and that captain must have a towing license. And we think that that's an absurd interpretation of that statute in light of 90 years of jurisprudence, most recently four months ago by this Court, that the act of towage is by a vessel with respect to another vessel. Well, but in that case, it had to do with whether one tug is towing another one when they're actually both towing a barge. And when our Court talked about dictionary definitions, it did mention the Oxford English Dictionary that it's just pulling. I don't see that that controls. I've never seen — I understand. And it would be nice if we had a precedent specifically construing 2101 sub 40. It would just be very consequential for us to rule on a legal statutory interpretation issue that isn't relevant to the issue here, where I thought the issue is just, is this jury instruction correct? If not, did it implicate or prejudice your limited liability argument? And that is our appeal. It did, because this jury was instructed that our captain was required to have a towing license. That issue should have gone to the jury. Is that what you're saying? Yes. And this is tantamount to a directed verdict. Then the jury is only hung up on the question of whether the owner had knowledge of the lack of a towing license. And we think that it couldn't be clearer. The jury's thought process is reflected in that note to the court. Where did the district court — did you say that issue, whether he should have had a license, was a jury question? See, that gets back to my point. I thought the primary argument you're saying here is it's one of statutory interpretation. It's a question of law. But you're at the same time saying that's a question to submit to the jury? Well, what we were saying is when we brought our motion for summary judgment, finding that this wasn't towage, and the judge saw fit to deny that, at that point he should have let it go to the jury. There was no pending motion the other way. There was no pending motion to find that the act of pulling the sonar constituted towing. But that's kind of water under the bridge. What we're saying now is that the court should not have instructed the jury that the captain needed a license. He didn't have that license. If he had done the things necessary to get that license, those things would have nothing to do with pulling a sonar around the floor of the Gulf of Mexico. And if he — and he couldn't get that license through a career of sonar surveying. The act of sonar surveying doesn't qualify him for a license. And getting a license by doing the things, having the expertise and the training that is necessary to get it — handling vessels, stability of the tow, safeguarding the vessel you're pulling — that would not give him any knowledge with regard to sonar surveying. The record doesn't confirm whether Coast Guard brought an enforcement action against the captain, does it? No. So although people are speculating and give hypotheticals both sides, we don't know what the Coast Guard's view of 2101 is, do we, in this record? We do not. So for us to announce, we interpret 2101 to require tow licenses would be very consequential on very little record. But to say the opposite, I think, would be just as consequential, right? It's a 25,000 foot cable being towed subsurface. You'd think you'd need at least as much licensing as towing a barge for towing something thousands of feet behind and under the boat. So I guess I keep trying to wonder, why are we being asked to make a legal opinion when really we should just assess, did his jury instruction alter the jury's assessment of the limited liability question before them? And to get you to question, as I thought Judge Afric said, as to that issue, what international management knew or should have known, you decide. Mr. Clements, keep asking about that. So you got every single witness to say, this license wouldn't have made any difference even if you need it. There wasn't a witness who didn't say that. So I just don't see where they were misdirected. The evidence notwithstanding, the judge instructed the jury that it was not in their hands to weigh that evidence. He instructed the jury that the captain had to have a license. And to give that instruction, he had to conclude that this was an act of towage. And we believe that's a misconstruction or an absurd interpretation of 21-01-40, which doesn't make any reference to what it is that must be getting pulled to constitute towing. Did I see in the briefs somewhere that there is a proposed amendment to 21-01-01 to add the word vessel after the verb pull? That's not in the record. But is that? It's a legislative fact. Is there a pending amendment? I'm not aware of that. You're not aware. Okay. I may be mistaken. I'm not aware of that. Is that a proposed jury question to the jury as to whether it was a towage issue or not? Or was that already taken care of by the judge's instruction? The judge determined that. That didn't go to the jury. You didn't even propose an issue. No. Because you lost your summary judgment. Excuse me? Because you lost the summary judgment. Yes. Yes. Yes. That's right. That's right. You said earlier about the absurdity. I'm sorry? You said something about how the interpretation is absurd because the statute doesn't refer to what's being towed. Yes. It doesn't say what's being towed in common sense. Isn't that why the district court did what it did? Did what? Doesn't that explain the district court's ruling? It's not limited to towing a vessel. Well, I don't think the judge ought to ignore 90 years of jurisprudence. And the Scheinbaum, the U.S. Supreme Court, this Court, in the context of different factual scenarios always said that the act of towage involved expediting the transportation of another vessel. It was among vessels. And so the next question would be then, was this sonar a vessel? We believe it clearly wasn't, but Judge Afric didn't even see that as a relevant question. Under Stewart v. Dutra, the U.S. Supreme Court has said what a vessel is, and this sonar device did not meet that definition. If the statutory regulatory scheme, other sections of 46 U.S.C. 2101, such as the definition of commercial, it refers to a means of transportation on water, moving goods, moving people, expediting the movement of another vessel. Judge Afric didn't get to any of that. He says if you're pulling, then you need a towing license. If a commercial speedboat is pulling a water skier, does the captain need a towing license to pull a water skier? If it's a charter boat, does a captain whose customer hooks into a fish, who's reeling it in, need a towing license? You have time for a rebuttal argument. Am I done? Well, you have time for a rebuttal. You can borrow from that if you want. I didn't mean to cut you off. Well, but my opponent's going to get into whole new issues. Well, I doubt it, because I've got some questions in that direction, too. But why don't we see what they have to say? All right. Thank you. Good morning, Your Honors. My name is Carmen Rodriguez, and I represent Tesla Offshore in this matter. Thank you for hearing our argument. We — I would like to address as succinctly as possible three issues before the Court. And the first one I want to address is the limitation of liability question. But I want to address it from a different perspective than International's counsel. And the point that I would like to make is that the Court is correct that the legal issue of whether or not there was — this was a towing vessel that required a towing license, a captain with a towing endorsement, is beside the point here because the evidence is overwhelming that International had both knowledge and privity to the negligence that was committed by Captain Lequeu and to the unseaworthiness of their vessel. The trouble with that is the jury sends out a question on the 25th and says exactly as to that — privity, complicity, whatever you want to call it — didn't you tell us the license is requisite, and didn't you also tell us he didn't have it, which suggests that the action that the jury thinks is the cause of the accident that the management would have to be aware of is precisely him being unqualified because he lacked the license that maybe he doesn't have to even have? So it's — how can we say that we know that that wasn't a factor in their decision? The question tells us that the jury was asking the question. It was trying to figure out what role this licensing or absence of a license played in the limitation liability question, and that was the right question for them to ask. It was important that they understand it. But they had more than two additional hours of deliberations before they came to their conclusion. They — the affirmative defense of limitation liability was the last question on the jury verdict. This is 130-plus pages long. Did Tesla or Shell focus in on the lack of a license as a basis for the captains being unqualified? I believe they did, Your Honor. I don't remember. That's the problem. I have no — absolutely, the argument was made because the jury — because the judge had made that ruling. But even setting that question aside, even if the court — the question before the court is, did the jury — does it have to reverse, overrule the jury's finding on this affirmative defense? And it actually — not only does it not have to, but it would be unreasonable for this court, in light of the evidence, the just abundance of evidence about knowledge and privity, that International knew that it had hired someone who was unqualified, who was incompetent, who had no knowledge, no background, no information, no training, no licensing that would allow him to do — to perform what to do in performing this particular tow. He didn't know what he was doing and — Well, he was doing what Tesla said. Well, he was doing what his port captain told him to do, which was to do whatever Tesla says. But, of course, he was the captain of the vessel. And he was operating the vessel. He didn't realize that the tow lines were — He — that's right. But he — he was — he was the captain of the vessel, Judge, and he was obligated to obtain the information he needed to be able to safely do his job. He was supposed to be operating that vessel, which includes a very long tail with a very big piece of equipment capable of committing $9 million in damages. And he had — the information about where the fish was at any given time was going back and forth between the two Tesla crews. He wasn't advised about the mooring lines, which he ran into, which he ran the tow fish into. He was not advised about it, but he had the obligation to figure it out. The problem is the Colregs — Colreg number seven — if I can take a second to find it, because I have it close by — says that the — that master of the vessel is obligated to know what's going — what risks he's — what collision risks he's running at any given time. And his lack of knowledge is no excuse. He has an obligation to stop and go get the information he needs. If he doesn't know what his risks are, if he doesn't have the information he needs, he's obligated to go get it. And the lack of information is no excuse. And he's not — under Colreg number seven and Colreg number eight, which we cited and attached to our brief, but I can't put my fingers on it right now. Are you in a position that a captain of a shrimp trawler needs to have a towage license pulling those nets? I don't know, Judge. This — the Mount case clearly concluded that a fishing vessel engaged in towing did not have to. And the reasoning there was that the language in 46 U.S.C. 210140, which is where Congress defined what a towing vessel is, that language says it's a commercial vessel engaged in the service of towing. Well, it doesn't say — it says pulling, right? Right, and pulling — in the service of pulling, pushing, or hauling aside. Thank you. And it does go to the jury, and it's a fact question. And we look at the winch and the cable and the thing being towed, and if it's enough like towing or pulling, it counts. The district court had no choice but to apply the law to the facts that were presented, the evidence that was presented in the context of a motion for summary judgment. International asked that this summary judgment — that this issue — this legal issue be evaluated and determined, and the judge made that decision. And as a result — and he had — he was given facts, and he was told — the district court was told that the parties agreed if this was a towing vessel, then there had to be a license. He did not actually reach that issue. He had — he was told by the parties that that was the legal ramification of the decision that this was a towing vessel. You cited Rule 51, but you didn't cite any case law on whether a pre-trial ruling preserves an objection. I didn't — The question is with the jury question and the answer. I did not judge because I think that this is a cautionary instruction. I think the facts here were pretty extreme. The judge had issued a ruling, and counsel Fischel knew on the day with this — Mr. Fazielli, he knew what — the questioning that was coming. And counsel Fischel stood up, objected, let the court know that he thought that the questioning was about to countermand being — his ruling, his prior ruling. And he instructed counsel for International not to ask the question. He warned him not to cross the line. He advised him it happens over several pages. And finally, when the Court understands that the question is going to be asked anyway, he stops, and he asks the only question that the expert can answer. And the question is, did he have a towing license, a towing endorsement? That was the only question that could be asked and answered in light of the ruling about the law, the applicable law that was in the books — on the books. And because — because of the buildup, I believe, Your Honor, our discussion of it is at page 28 to 33 of our primary brief. And you can — we actually went through and tracked and described the increasing efforts by the Court to prevent this expert from crossing the line and testifying counter to what he had already ruled the law required. And — Are you finished? I'm sorry. Yes. Yes, Judge. Thank you. Before hiring the Thunder, which was a supply vessel, what kind of vessels did Tesla hire to perform these kind of sonar operations? Well, they had hired — I don't know the answer to that question. I know that Tesla did have its own vessel, but it had a vessel, and it could only conduct one at a time. A towage license? I don't know, Your Honor. There's no evidence in the record on that point. Those are two different questions. There's no evidence in the record, or you as an officer of the Court do know? As an officer of the Court, I don't know, Your Honor. I have no idea. I thought Cardone testified, the guy, the real sonar superstar, he testified that he'd much rather have fishermen. He doesn't even want tug pilots who are licensed as towers. He wants fishermen, the implication being that people out there are hiring folks without towing licenses. That's the implication. I think it's entirely possible that that's true. I also think that the truth of the matter is that if Captain LeCue had been competent, even though unlicensed, we would not be here today. The problem is, he had no — What if your people had told him about the mooring lines? They wouldn't have run into it. Absolutely, Your Honor. But the truth of the matter is, is that our crew did not know about the mooring lines. I thought they knew about it. Yeah. The information had been provided to Tesla in February of 2012, along with the information that the vessel, the Nautilus, would only be operating in this area until August of 2012. And this survey was being done in November of 2012. Pretty obvious it was there. It was a rig. Right. Right. It was pretty obvious. But the information about its anchoring system was in the store — in the computer on shore. And it was not — that information was not loaded into the computers that went out because the people on shore believed that the Nautilus had moved on, had completed its — It was negligence when they saw the rig there not to have given them follow-up information. Your Honor, we have not asked that the Court shift 100 percent of the liability to International because we know that the evidence that was presented to the jury was such that the jury would not — Excuse me. We're only here on limited liability. We're actually here for — On the second issue. On the second issue, which is — which is where I'm going to the allocation of liability. But before you get there, if we accept the way the parties have framed it, that this is a question of statutory interpretation and the Fifth Circuit has to pronounce hereafter if commercial fishermen forever have to have licenses or not, if that's before us, their argument is, in spite of the plain language, the absurd consequences mean we have to insert the word vessel. I have two questions. Am I right from reading somewhere in the briefs that, in fact, there's a pending amendment to put the word vessel in, if you know? That was — that's a comment in the Mount decision, Judge, which is the Hawaii district court case. It was a comment. It was a comment by the Court that, in that case, the — I don't remember if the defendants or the plaintiffs, one of the parties had argued, the defense probably, that the word vessel was about to be inserted through the — you know, legislative efforts. But because that had not actually happened yet, the Court could not consider that as the law. So that's where — as far as I — that's the only place I've seen it, Your Honor. That's the only — You have no idea what the Coast Guard thinks. It's just not in this record. There was no enforcement action against the captain? Correct, Your Honor. And — Do you have any objection to us simply asking the Coast Guard if it wants to express its views? We have no objection at all, Your Honor. I think the biggest — the bigger problem is that this Court doesn't need to address it. It's an issue that's — Right. I get your point that there are other ways to find privity knowledge. Let's say we decide we want to address the issue that we feel — Right. Right. You don't have any concern. There's no reason why we shouldn't ask, as far as you're concerned. I have — I know of no reason at all for — to resist the Court's effort to get that information. It could be layered. I'm fascinated by it. But if they submitted a view on how to — what the statute means, would either side be arguing that that view is entitled to deference? In the blind. If they presented that — if they presented that view in accordance with their procedures, with the Administrative Procedure Act, I have no reason to believe that the deference shouldn't be accorded. But I also think, no matter what their answer is, that it doesn't change the outcome here. I'm really bad with analogies and inventing hypotheticals. My law clerks will tell me that. But here's the hypothetical. Try it. If every pilot or captain of a boat had to have a certificate from Alcohol Anonymous that they pass, if the judge said that's the law, but he was wrong, and then the judge said he didn't have that certificate, and the jury comes back finding that there's privity and negligence, wouldn't it be a reasonable inference that the — that the jury had inferred that the captain was unqualified because he didn't have the Alcohol Anonymous certificate? I think — I think the answer would — it depends entirely on the context, whether it would be reasonable to infer depends upon the context. In this particular context, the amount of evidence is really high about privity and knowledge entirely aside. What about the evidence being high that every witness that even spoke to the towing license said it wouldn't have instructed on subsurface towing? Your Honor, what — if he had gotten the license, what he would have learned is that a — the captain of a vessel that is towing anything is required to make sure that his tow doesn't run into third parties' equipment, does not harm innocent bystanders. Does everyone know that? I — I would — I would like to believe that everyone knew that, Judge, but I'm going to ask the Court to look closely at the testimony of Captain LeCue, the captain of the vessel, on pages 6654 through 6657. It's three full pages, and Counsel Forshell is asking him, what does he know about his obligation? What is his responsibility with regard to this tow? And he just point-blank refuses to acknowledge that he has any role to play in that tow. It is beyond clear that Tesla was responsible for the survey that was going on. They — Tesla was — had hired the boat, Tesla was doing this work, and Tesla was responsible for when it went in the water, when it came out, and where it was in the water. But the captain of the vessel was the master of this vessel, and he had an obligation not with regard to what Tesla was doing so much, but with regard to what was happening on his vessel and how that was impacting the world around him. The coal regs, which are the international regulations for the prevention of collisions at sea. The contract between International and Tesla. What about their common-sense question of, would — is your position legally that this would extend to commercial fishermen or lobstermen that are pulling a lobster pot behind the boat? So I think the analysis used by the Mount Court was really right on point. And the — what the said there is that if you look at the language of 4101 — or 210140, is that if you — it says that it's a commercial vessel in the service of — providing the service of pulling, pushing, whatever. In the Mount case, the fishing vessels were not providing the service of pushing or pulling. The pushing or pulling and hauling aside was an incidental to the service they actually were engaged in. And — I've also never heard, just as a matter of plain meaning, anybody refer to a fishing vessel as a towing vessel. This is not terminology that at least I've ever heard. Right. Right. And in that particular case, they would — they would use the fishing — the raised fish inside of cages. And they would have to move the cages around every once in a while. But the hauling and the pulling was incidental to the fishing. The commercial — the commerce involved there was fishing. In this particular case, there's a contract, and the contract is for the use of this vessel to haul, to tow this equipment through the waters of the Gulf of Mexico. Is it helpful to your position that — I mean, it seems like fishing vessel is a separately identified term in the same provision we're talking about. Yes, sir. Now, there is a provision, and I don't remember where — which page it's on, but there's a provision that allows one vessel to occupy two different classifications at the same time. So the utility boat could become a tow. Precisely. And so it can — that classification is an option. Multiple classifications, I guess, is possible. Before I close, this is a cross-appeal, and some of the things that my Internationalist Council are about to respond to might very well be things that I've never heard before. And if I could be — okay. Okay. All right. We ask that the Court affirm the ruling on the limitation of liability defense. We ask that the Court change the allocation of liability to 50-50. We've — we've explained why that is — the current allocation is inconsistent with maritime law. And we ask that the Court change the amount of Tesla's contribution claim to represent 25 percent of its payment, of the — the overage of its payment. Thank you for listening to our argument. What do you make of the fact that 2101 separately defines fishing vessel, recreational vessel — I'm sorry. What do I make of — What do you make of the fact that 2101 separately identifies and defines different terms — fishing vessel, recreational vessel, and towing vessel? I ask because of your absurdity hypotheticals. Well, the — I don't know what the Coast Guard, who really promulgates these regulations that Congress passed, has had in mind in that respect. They're different animals. I think that's probably what they had in mind. Towing is — Does that cut against your absurdity argument, then? I'm — I'm — I'm focused just on the — on the district court's interpretation of 2101-40, and that the act of pulling constitutes towage and requires the captain to have a towing license. I think that is an absurd interpretation of that statute in — in every sense. I'm sorry to burn your time, but you're suggesting that — that — that the district court's framework naturally leads to sweeping in fishing vehicles, vessels, and recreational vessels, water skiing and whatnot. And what I'm wondering is, do we avoid going down that slippery slope because there's a separate provision to cover fishing vessels? There's a separate vision — provision to cover recreational? Well, the — the district court's interpretation of towage would trump all of that. The act of pulling — Not necessarily. You could just accept that as a plain — as a matter of plain meaning, towing vessel is different from fishing vessel and different from recreational vessel, as Congress seems to have suggested in drafting the statute. Well, there's no indication that the court had that in mind. All I can do is argue what's in the record below, and that's the interpretation of 2101-40, which I think leads to an absurd result. If I could talk for a minute, because I think this — this is pertinent to several issues raised on appeal. What this operation was, was what Tesla ordered. They ordered up an OSV, an offshore service vessel classified by the Coast Guard as such, with a crew licensed to their control shack, their doghouse control shack, their technicians on board the stern cargo deck to — to run this sonar operation. I submitted a demonstrative number one this morning because it's simply a clearer picture, view. IOS trial exhibit 28 has been copied so many times. What appears before you in the record is dark. But the point of this is simply, this is a screenshot from an EasyNav. That is the piece of equipment that Tesla put in the wheelhouse of the International Thunder. They set the heading numerically. On this demonstrative, it's 71.7. And there is a little yellow arrow which tells the captain how close he is to following that course. And under the charter agreement, the captain is obligated to take these instructions and follow them. And he is given by Tesla an EasyNav computer to do just that. They do not, on the other hand, give him access to the CODIS system, which they have in their control shack, and the Quincy computer, which — Is this argument going to the allocation point? The allocation. And also that there's nothing — the captain could not, if he got a towing license, know anything about a Quincy unit or a CODA system which tells the — which would tell the observer just where the fish is in the water. But you presented this to the jury. So isn't this arguing against the thought that the jury drew some improper influence in the lack of the towing license? If it was crystal clear to them that towing license or not, Tesla was running everything? Well, you know, the judge looks at the jury and says, You heard all that evidence, but I'm instructing you that the captain needed a towing license. And in the very next sentence, he says, But that doesn't mean anything about what International knew or should have known. You've heard the evidence, and that's what you have to decide. I don't know how a rational juror could separate out — could see around the instruction that the judge gave more than once that the captain needed a towing license. Okay. Thank you very much. Okay. Let me — my opponent did this. Let me say what we are asking for in this case is not a new trial on liability, not to upset the jury verdict as to its allocation of fault, but simply to give us a fair shot to put on a limitation of liability defense in the district court. Thank you very much. Thank you. Before Judge Affreck. Before Judge Affreck, yes. Yes, that would be an amnesty proceeding in a bench trial. That concludes the cases for the day.